IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Jeffrey Plank, | : | |
| | : | Case No. 1:19-cv-935 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting in Part and Denying in |
| Great American Financial Resources, | : | Part Defendant's Motion for Summary |
| Inc., | : | Judgment and Denying Plaintiff's Motion |
| | : | for Partial Summary Judgment |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 26) and Plaintiff's Motion for Partial Summary Judgment (Doc. 25). Both parties have filed Responses in Opposition (Docs. 37, 38) to which both filed Replies (Docs. 42, 45). For the reasons that follow, Defendant's Motion for Summary Judgment (Doc. 26) will be **GRANTED IN PART AND DENIED IN PART**, and Plaintiff's Motion for Partial Summary Judgment (Doc. 25) will be **DENIED**.

## I.    BACKGROUND[1]

### A.  Plaintiff's Employment at Great American Financial Resources, Inc.

Plaintiff Jeffrey Plank was hired by Defendant Great American Financial Resources, Inc. ("Great American") in 2003, and in 2009, he was hired into the role of IT Scheduling Analyst ("Scheduling Analyst"). (Plank Dep., Doc. 23 at PageID 179–80.) In that role, Plank was responsible for managing and scheduling data processes to ensure they ran in the correct order and at the correct times.

Although Great American employed four Scheduling Analysts at the time he began in the role, the number decreased to two over time. (*Id.* at PageID 181–82.) According to Plank, the

---

[1] The facts are derived from the parties' Proposed Undisputed Facts (Docs. 25-1, 26-1) and Responses (Docs. 37-1, 38-1) except where specifically noted otherwise.

workload remained the same, but due to new software that offered more automation, the leaner IT staff was able to complete the work. (*Id*. at PageID 186.)

Between April 2010 and March 2018, Plank was rated as "successful" in every performance review he received. (Doc. 31-2 at PageID 426–27.) He had no history of discipline and never was placed on a performance improvement plan. (Knapp Dep., Doc. 31 at PageID 360; Lemmon Dep., Doc. 32 at PageID 457.) Effective March 2018, Plank was promoted to the position of Senior Ops Scheduling Analyst. (Knapp Dep., Doc. 31 at PageID 358–60.)

**B. Plank's Stroke**

Plank suffered a stroke on February 4, 2018. He was diagnosed with a cerebrovascular accident due to thrombosis of the right posterior cerebral artery; left homonymous hemianopsia; and occipital stroke. (Plank Decl., Doc. 35-1 at PageID 632.) Plank was discharged from the hospital four days later, but continued to experience severe headaches, fatigue, weakness, numbness, and tingling (neuropathy), balance issues, and vision loss following his release from the hospital. (*Id*.) He treated with specialists at Drake, Christ Hospital, and the Cincinnati Eye Institute to regain skills he lost as well as to treat his new visual deficiencies and neuropathy pain. (*Id*.)

Great American granted Plank's request for FMLA leave, which he exhausted on April 27, 2018, as well as a request for additional leave. In May 2018, Plank notified Great American that he was ready to return to work, and he submitted a proposed schedule from his physician in which he would work his way back to full-time over several months. Great American approved this request, and Plank returned to work part-time on May 1, 2018. (Doc. 33-1 at PageID 580.)

Plank testified that he asked three managers if he could work from home full-time or nearly-full-time: Sharon Knapp, who was his manager until her retirement in August 2018; Scott

Spitznagel, who replaced Knapp; and Knapp/Spitznagel's supervisor, David Stricker.  (Plank Dep., Doc. 23 at PageID 187–92, 214, 227–28.)  According to Plank, all three denied his requests.  (*Id.*)  He was permitted to work from home on occasion, but there were times when Plaintiff was told by his manager that he could not do so.  (*Id.* at PageID 191–92.)  He testified: "I'd say, hey, is there any chance I could work from home tomorrow, is there any chance I could work from home a couple of days this week.  And it would be like, well, we've discussed that, and no, we need you in here."  (*Id.* at PageID 192.)

Neither Knapp nor Spitznagel recall having such conversations.  Knapp has no memory of a conversation with Plank about working from home on a permanent basis, although she recalls discussing with Plank that he could work from home until he could get on a later bus to assist with his issues with bright lights and vision.  (Knapp Dep., Doc. 31 at PageID 375–80.)  Knapp also testified that Plank was able to work from home on occasion and was not required to ask permission on any given day, but needed to send a note or give her a call to let her know that he was doing so.  (*Id.* at PageID 377.)  Spitznagel testified that he and Plank "did not talk about working from home."  (Doc. 34 at PageID 606.)

### C.  Plaintiff Has Trouble Meeting His Schedule and Requests a Second Leave of Absence

Plank missed multiple days of work in June 2018.  (Plank Dep. Exhibits, Doc. 23 at PageID 252.)  Several times, he emailed Knapp to call off work and described ongoing pain that required him to take or be administered pain medication.  (*Id.* at PageID 246–53.)  At the end of June 2018, Knapp suggested that Plank take another leave of absence because she was concerned he returned to work too soon.  (Plank Dep., Doc. 23 at PageID 197.)   Plank requested and was granted an additional two months of leave, which began on June 28, 2018.  (Time Sheets, Doc.

33-1 at PageID 582.)

While he was out on his second leave of absence, on August 2, 2018, Candice Ruby, Benefits Administrator for Great American, informed Stacy Lemmon,[2] Employee Relations Director at Great American, that Plank was approved for long-term disability benefits ("LTD") through October 31, 2018.  (LTD Email, Doc. 35-2 at PageID 647.)  In an email chain about this, Stricker responded that Lemmon was going to try to convince Plank to take LTD.  (*Id*. at PageID 646.)  Knapp replied that she believed it "would be best for him unless he's made some good progress in the last few weeks." (*Id*.)  However, when Plank was informed of the availability of LTD, he declined because he believed he could return to work successfully if granted necessary accommodations.  (Plank Decl., Doc. 35-1 at PageID 633.)

On August 17, 2018, Plank submitted a doctor's note that suggested he return to work on a gradual schedule again building up to full time over one month.  (Plank Dep. Exhibits, Doc. 23 at PageID 254.)  The doctor also suggested that he use a larger computer monitor because of his eye condition.  (*Id*.)  Great American granted both requests, but Plank did not receive the larger monitors until on or about September 19, 2018.  (Unopposed Notice of Correction by Interlineation, Doc. 39; Doc. 35-1 at PageID 633.)  Until he received the monitors, the smaller screens exacerbated Plank's vision issues, which caused eye strain and headaches. (Plank Decl., Doc. 35-1 at PageID 633.)

Around the timing of his second return to work, Plank's manager changed to Spitznagel. Plank asked Spitznagel for permission to work from home, but Spitznagel denied the request. (*Id*.; Plank Dep., Doc. 23 at PageID 187–88, 227.)  Plank returned on a graduated return schedule on September 4, 2018.  (Time sheets, Doc. 33-1 at PageID 583.)  Once again, Plank's attendance on his graduated return schedule was erratic, many times related to pain management and having

---

[2] Previously, Stacy Hensley.

to take pain medication. (Plank Dep. Exhibits, Doc. 23 at PageID 256–60.)

### D. Decision to Terminate Plank's Employment

On September 19, 2018, about two weeks after his return to work, Spitznagel set up a meeting at Stricker's request between himself, Stricker, Lemmon, and Ruby to "have a discussion and a level set conversation about Jeff. I wanted to make sure we are following appropriate steps with myself being new to managing Jeff (started 9/10)." (Spitznagel Dep., Doc. 34 at PageID 608, 614; Meeting Invite, Doc. 32-1 at PageID 513.)

On September 25, 2018, Spitznagel, Lemmon, and Stricker met for about thirty minutes to discuss Plank and his termination from employment.[3] (Lemmon Dep., Doc. 32 at PageID 480.) Lemmon recalls everyone was concerned that Plank was unable to come into work and that he was going to require another leave of absence. (Lemmon Dep., Doc. 32 at PageID 489.) Since Plank had returned from his second leave of absence, none of the individuals in attendance had contacted him to discuss his attendance, physical limitations, or possible alternate accommodations. (*Id*. at 482–83; Spitznagel Dep., Doc. 34 at PageID 611–12; Ruby Dep., Doc. 33 at PageID 564.) Spitznagel testified that he had no idea Plank suffered from physical limitations as a result of his stroke and that he "didn't get specifics on why he was not in the office." (Spitznagel Dep., Doc. 34 at PageID 616.)

At the meeting, the decision was made to terminate Plank's employment. Lemmon recalls: "After discussing the accommodations that Great American had already provided to Plank, we decided those were not working as Plank was having continued attendance issues." (Lemmon Decl., Doc. 24 at PageID 276.) Lemmon informed Plank of the decision later that day. (*Id*.)

---

[3] Candice Ruby may have also been present at the meeting, but she does not recall whether she attended, and Lemmon and Spitznagel do not recall her being there. (Ruby Dep., Doc. 33 at PageID 564; Spitznagel Dep., Doc. 34 at PageID 614; Lemmon Dep., Doc. 32 at PageID 479.)

### E.  Plaintiff's Post-Termination Employment

At the time Plaintiff's employment with Great American ended, Plaintiff was earning

$69,921.54 annually.  Although unemployed at the time of his deposition, Plank has held three

positions since his employment with Great American ended: (1) a customer service

representative for Divisions, earning $38,000 annually, from which he was terminated due to

insufficient work performance; (2) part-time shelf-stocker at Meijer, earning $12.20 per hour,

from which he voluntarily left for his next job; and (3) part-time shelf-stocker at Kroger, earning

$13.00 per hour, from which he resigned due to the physical demands of the job.  (Plank Dep.,

Doc. 23 at PageID 169, 165, 213; Plank Decl., Doc. 21-2 at PageID 154.)

### F.  Procedural Posture

Plaintiff initiated this employment discrimination action on November 4, 2019.  (Doc. 1.)

He brings the following claims against Great American: (1) failure to accommodate a disability

in violation of 42 U.S.C. § 12101 and Ohio Rev. Code § 4112.02; (2) disability discrimination in

violation of 42 U.S.C. § 12101 and Ohio Rev. Code § 4112.02; (3) retaliation in violation of 42

U.S.C. § 12101 and Ohio Rev. Code § 4112.02.  (*Id*.)  On March 3, 2021, Defendant moved for

summary judgment on all claims[4] (Doc. 26), and Plaintiff moved for partial summary judgment

on Defendant's mitigation defense (Doc. 25).

## II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary

judgment is appropriate if "there is no genuine issue as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant has the burden to

---

[4] In responding to Defendant's motion for summary judgment, Plaintiff conceded he does not oppose dismissal of his retaliation claim, rendering summary judgment for the Defendant on the retaliation claim appropriate. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment.").

show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–587 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*) (emphasis removed). A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) ("A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party.") (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Rule 56 applies equally to a motion on a defendant's affirmative defenses. *Resolution Tr. Corp. v. Metropole Bldg. Ltd. P'ship*, 110 F.3d 64, 1997 WL 160330, at *2 (6th Cir. 1997).

"Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson,* 371 B.R. 798, 800–01 (B.A.P. 6th Cir. 2007).

## III.   ANALYSIS

The Court will first consider Defendant's Motion for Summary Judgment on Plaintiff's failure to accommodate and disability discrimination claims.  Next, it will turn to Plaintiff's Motion for Partial Summary Judgment on the defense of mitigation of damages.  For the reasons set forth below, questions of fact preclude summary judgment on both Motions.[5]

### A. Defendant's Motion for Summary Judgment on Plaintiff's Failure to Accommodate and Disability Discrimination Claims

Defendant moves for summary judgment on Plaintiff's failure to accommodate and disability discrimination claims brought under the ADA and Ohio law.  The ADA, as amended in the ADAAA, provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Discrimination is defined to include "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant."  42 U.S.C. § 12112(b)(5)(B).  Because the federal and state statutes contain similar prohibitions, courts rely on interpretations of the ADA as persuasive authority in interpreting

---

[5] However, as discussed *supra*, summary judgment is appropriate on Plaintiff's conceded retaliation claim.

Ohio's disability discrimination law. *Hostettler v. College of Wooster*, 895 F.3d 844, 848 (6th Cir. 2018); *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697 N.E.2d 204, 206–07 (1998). Thus, Plaintiff's disability discrimination claims under Ohio law rise or fall with his federal claims.

### 1. Failure to Accommodate Plank's Disability

Plaintiff asserts that Defendant failed to reasonably accommodate his disability. An employer's failure to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of "discrimination," for which the "direct evidence" test is used. *Tchankpa v. Ascena Retail Grp., Inc*., 951 F.3d 805, 811 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007) (quoting 42 U.S.C. § 12112(b)(5)(A))).

This Circuit uses a multi-part test to evaluate reasonable accommodation claims:

(1) The plaintiff bears the burden of establishing that he or she is disabled. (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. (3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Id.* (citing *Kleiber*).

"To show that [he] is otherwise qualified for a position—and thus meet [his] *prima facie* burden—an employee must show that [he] can perform the essential functions of a job with or without an accommodation." *Hostettler*, 895 at 854. Essential functions of a job are "core job duties" the removal of which "would fundamentally alter the position." *Id.* (citing 29 C.F.R. § 1630.2(n)(1)). As to attendance:

Although this court has stated that "[r]egular, in-person attendance is an essential function" of most jobs, *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762–63 (6th Cir. 2015) (*en banc*), it is not unconditionally so; courts must perform a fact-intensive

analysis. In determining what functions are essential, courts may consider as evidence—among other things—the amount of time spent on a particular function; the employer's judgment; "written job descriptions prepared before advertising or interviewing" for the position; and the consequences of not requiring the employee to perform the particular function.

*Id*. (citing 29 C.F.R. § 16302(n)(3)).

A plaintiff must propose a reasonable accommodation to succeed. *Id*. (citing *Walsh v. United Parcel Serv.*, 201 F.3d 718, 725–26 (6th Cir. 2000)). "[R]equested accommodations are reasonable only if they 'address a key obstacle preventing [the employee] from performing a necessary function of [his job]." *Id.* at 812 (citing *Jakubowski,* 627 F.3d at 202). Absenteeism may prevent a Plaintiff from proving that he was "otherwise qualified" under the ADA. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 322 (6th Cir. 2012). "But this logic does not apply if the absenteeism is caused by an underlying failure to accommodate a disability." *Fisher v. Nissan N. Am.*, 951 F.3d 409, 418 (6th Cir. 2020).

### a. Dispute of Fact Over Whether Plank was "Otherwise Qualified"

Defendant argues that regular attendance was an essential function of Plaintiff's job, and his erratic attendance rendered him unqualified and unable to meet the second prong of his prima facie case. Plaintiff, on the other hand, argues that he was qualified for his position with the reasonable accommodations he requested but which were denied and delayed.

Plank testified that he requested the accommodation of working from home on a full-time or nearly-full-time basis "too many times for me to even count," but the requests were rejected or he was told to wait and see. (Plank Dep., Doc. 23 at PageID 227.) Most relevant to the timeline of his termination from employment, Plaintiff averred that he asked Spitznagel, his new manager as of Knapp's retirement in August 2018, to work from home full-time or nearly-full-time, but the request was denied. (Plank Decl., Doc. 35-1 at PageID 633; Plank Dep., Doc. 23 at PageID

187–88, 227.)

Plank asserts he could have performed all essential functions of his job if he were permitted to work from home full-time or nearly-full-time. He testified that working from home helped him manage his ongoing stroke-related issues. He could control the lighting and work in a dark environment at home, avoid the hour-long bus commute, and get up frequently to move to avoid his neuropathy pain. (Plank Dep., Doc. 23 at PageID 190–91.) He testified that had he been granted those accommodations in a timely manner, his health would have improved such that he could carry out his job successfully and be employed at Great American today. (*Id.* at PageID 229.) He further testified that several times he told his manager that he could log on and do the work from home, but it was "too much for me to come into work." (*Id.*) Plank's doctors told him it would be a "big benefit" for him to work from home and were willing to provide a note if needed. (*Id*. at PageID 227–28.) However, he was not asked for a doctor's note to support his request to work from home full-time or nearly-full-time.[6] (*Id.*) The record contains evidence that Plaintiff was permitted to work from home at times, and Defendant has not cited evidence of his being unable to complete his work at home (aside from the days he was absent).

Defendant denies that Plaintiff requested to work from home full-time or nearly-full-time. Nonetheless, according to Defendant, Plaintiff was never denied the opportunity to work from home because evidence demonstrates that he was able to work from home on an as-needed basis when he would email day-of or day-before and request to do so.[7] Further, Defendant contends that the reasons Plaintiff provided for calling off work indicated he was in too much pain or under the influence of pain medication and therefore unfit to work at the office or at home.

---

[6] Great American does not have a standard practice requiring medical documentation for accommodations but occasionally will request medical documentation. (Lemmon Dep., Doc. 32 at PageID 473.)
[7] Plank refutes this, arguing that he was denied the opportunity to work from home multiple times when it was discussed in person. (Plank Dep., Doc. 23 at PageID 191–92.)

Further, Defendant argues that it need not create a new job to accommodate a request for an accommodation, and working from home would have modified his position.

Plank has identified evidence that he did successfully work from home on occasion and therefore could perform his job functions at home. He has also identified evidence lending support to his position that he would have been absent less if he could have avoided working in the office. "An employer cannot deny an accommodation that the worker claims will make him able to perform the job and then argue that the worker's allegedly correctable performance justified termination." *Gilday v. Mecosta Cty.*, 124 F.3d 760, 766 (6th Cir. 1997). *See also Fisher*, 951 F.3d at 418 (absenteeism caused by an underlying failure to accommodate a disability does not render an employee unqualified for his position). The Court finds there is a dispute of fact as to whether Plank's proposed accommodation was reasonable and whether it would have made him qualified to perform the essential functions of his job.

**b. Question of Fact as to Whether Plank Was Denied a Reasonable Accommodation**

Defendant argues that even if Plank is otherwise qualified, he was not denied a reasonable accommodation. Defendant contends that Plaintiff was granted every accommodation he requested. Defendant argues that Plaintiff was granted FMLA leave, then a gradual return to work schedule, and when he was still struggling with returning to work after his stroke, another leave of absence. Upon returning to work following his second leave of absence, Great American agreed to a graduated work schedule and to provide Plank with larger computer monitors. Great American asserts it also allowed Plank to work from home whenever he asked.

Upon receiving a requested accommodation, an employer bears the responsibility of considering: (1) the particular job involved, its purpose, and its essential functions; (2) the

employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee. *Tchankpa,* 951 F.3d at 812 (citing *Keever v. City of Middletown*, 145 F.3d 809, 812 (6th Cir. 1998)). The employee and employer must engage in "an informal, interactive process" to negotiate an accommodation that allows the disabled employee to work despite his limitations. *Id. (citing Banks v. Bosch Rexroth Corp.,* 610 F. App'x 519, 529 (6th Cir. 2015)).

Crediting Plaintiff's version of events, Plaintiff was not granted every accommodation he requested because his requests to work from home full-time or nearly-full-time were denied. Plaintiff claims he would have been willing to provide medical documentation to support his requests, but was never asked for it, and Great American has no standard policy requiring it.[8] The request to work from home on a full-time or nearly-full-time basis implicated his employer's continuing mandatory duty of good-faith participation in the interactive process, but based on Plaintiff's testimony, the process ended with his requests and no discussion. Spitznagel and Knapp both denied Plaintiff made a request to work at home full-time or nearly-full time. Spitznagel testified he did not know Plank had physical limitations, despite knowing Plank suffered a stroke, returned to work on a graduated schedule, and requested special monitors. (Spitznagel Dep., Doc. 34 at PageID 615–16. *See also* Lemmon Dep., Doc. 32 at PageID 463; Ruby Dep., Doc. 33 at PageID 555.) Thus, a question of fact exists over whether Plaintiff triggered the Defendant's duty to engage in the interactive process.

---

[8] An employer may request medical documentation supporting an employee's requested accommodation, and it follows that an employee's failure to provide requested medical documentation supporting an accommodation precludes a failure to accommodate claim. Further, employers need not immediately implement or accept a proposed accommodation. *Tchankpa*, 951 F.3d at 812. But here, Great American does not have a standard policy requiring such medical documentation, and Plaintiff was not asked for it. Plaintiff claims he would have been able to provide medical documentation supporting his request had he been asked, as his doctors assured him it would be beneficial for his health to work from home.

Further, at this juncture, Defendant has not demonstrated that working from home on a nearly-full-time or full-time basis would have been an undue burden or that the challenged job criterion, physically working at the office, was essential. *C.f. E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 757 (6th Cir. 2015) (regular and predictable on-site job attendance was an essential function of and prerequisite to perform other essential functions of the employee's resale-buyer job, and so due to repeated absences, she was not qualified for her position, and the employer did not fail to reasonably accommodate her disability by refusing the request to telecommute up to four days per week); *Pullins v. Conagra Brands, Inc.*, No. 3:19-cv-21, 2020 WL 3057861, at *6 (S.D. Ohio June 9, 2020) (employer showed, through job description and position responsibilities, that working 8-10 hours per day on site at a production facility was an essential function of the job, and part-time work did not exist on the production line).

In sum, summary judgment on this claim is inappropriate, as a significant dispute remains over whether Plaintiff requested and was denied a reasonable accommodation, and whether Defendant failed to engage in the interactive process.[9]

## 2. Disability Discrimination

Defendant also moves for summary judgment on Plaintiff's claim that he was terminated from employment due to his disability. The burden-shifting scheme of *McDonnell Douglas*

---

[9] The two-week delay in receiving larger computer monitors is not actionable as a denied accommodation. Plaintiff requested larger computer monitors to assist his return to work, which Great American provided approximately two weeks later and one week prior to his termination from employment. A short delay is not actionable as a denied accommodation where the delay is due to internal processing or events outside the employer's control. *Gerton v. Verizon South Inc.*, 145 F. App'x 159, 168 (6th Cir. 2005) (finding employer reasonably accommodated employee where the was no evidence that the delay in granting a request for an accommodation was unreasonable). *See also Kaminsky v. Wilkie*, --- F. App'x ---, 2021 WL 2018653, at *4 (6th Cir. May 20, 2021) (affirming summary judgment for employer on failure to accommodate claim where requested accommodation was delayed due to internal processing and events outside employer's control and employee was partially to blame for delay). In this case, there is evidence that Defendant did not have larger monitors in stock but suggested a slightly different size, which Plaintiff agreed to try. (Doc. 35-2 at PageID 642.) Plaintiff has not identified any evidence of unreasonable delay.

applies to disability discrimination claims.  *Whitfield v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011).

A disability discrimination plaintiff must support the following elements of a prima facie case:

> 1) [H]e or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Id.* (internal quotation and citation omitted); *see also Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019) (same).  The disability must be a but-for cause of the adverse employment action.  *Tennial v. United Parcel Serv.*, 840 F.3d 292, 306–07 (6th Cir. 2016).

If a plaintiff can establish a prima facie case, the burden of production shifts to the defendant to produce a legitimate, nondiscriminatory reason for the action.  *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020).  The burden then shifts to the employee to show that the defendant's stated reason was pretext for the adverse employment action.  *Id.*  A plaintiff can establish pretext by showing: (1) the employer's stated reason had no basis in fact; (2) the stated reason did not actually motivate the employer; or (3) the stated reason was insufficient to warrant the adverse employment action.  *Id.* (citing *Hostettler*, 895 F.3d at 858).

Defendant argues Plank cannot establish disability discrimination because he cannot establish that he was qualified or pretext.  As the Court explained above, there is a question of fact as to whether Plaintiff is otherwise qualified.  Assuming Plaintiff meets his prima facie burden, Defendant has come forward with a legitimate non-discriminatory reason for his termination from employment: absenteeism.  In response, Plaintiff argues that issues of fact exist as to whether Plank's absences actually motivated his discharge and/or were sufficient to motivate the discharge.  In support, he cites evidence that Great American was hostile to his disability.

15

As to pretext, Defendant argues that the termination decision was unrelated to any alleged requests for accommodation.  Defendant argues: (1) the LTD benefits email sent by Stricker does not show discriminatory animus because it was outside the decision-making process; (2) Plank's termination without warning does not establish pretext because there is no evidence that a warning was required under Defendant's policies; and (3) Plaintiff conflates this claim with his failure to accommodate claim.  *See, e.g., Turppa v. Montmorency Cnty.*, No. 09-12974-BC, 2011 WL 10940989 (E.D. Mich. Oct. 26, 2011) (isolated comments too abstract to establish pretext); *Coulter v. Deloitte Consulting, LLC*, 79 F. App'x 864, 868 (6th Cir. 2003) (no warning prior to discharge was insufficient to establish pretext).

Plaintiff has identified some record evidence that could support a finding of pretext beyond the cited email and fact that Plaintiff was terminated without warning.  For instance, Spitznagel set up a meeting to discuss whether Plank's requested accommodations were helping him be successful at work only two weeks after Plank's return to work, while he was still on a graduated schedule, and before Plank had received the larger computer monitors he requested to aid his vision issues.  Plank was not included in the conversation, and Spitznagel testified he did not have a full understanding of Plaintiff's physical limitations or have any conversation about them with Plaintiff.  Yet, Spitznagel was aware that Plaintiff was returning on a graduated schedule and needed special monitors as an accommodation to his medical issues, which raises an issue of credibility.  Although Defendant argues that the email about pressuring Plaintiff to take LTD benefits was outside the decision-making process, this email relates to the ongoing concern that Plaintiff needed another leave of absence.  For instance, Lemmon testified that the individuals who attended the meeting to discuss Plank's termination from employment were concerned Plank was going to request another leave of absence.  The Court does not find that this

evidence conflates Plaintiff's discrimination claims. Rather, viewing this record in the light most favorable to Plank, a factfinder could conclude Plaintiff's disability was the true reason for his termination from employment.

Thus, summary judgment at this stage is inappropriate, as material questions of fact preclude it.

### B. Plaintiff's Motion for Summary Judgment on Defense of Mitigation of Damages

Plaintiff moves for summary judgment on Defendant's mitigation of damages defense. "The [ADA] requires an employee to use reasonable diligence to mitigate damages. To that end, it limits back-pay and front-pay awards by the 'amounts earnable with reasonable diligence by the person ... discriminated against.'" *Gunter v. Bemis Co., Inc.*, 906 F.3d 484, 490 (6th Cir. 2018) (citing 42 U.S.C. §§ 2000e-5(g)(1), 12117(a) and *Pittington v. Great Smoky Mountain Lumberjack Feud, LLC*, 880 F.3d 791, 799–800 (6th Cir. 2018)). "The employee bears the initial burden of proving damages with 'reasonable certainty.'" *Id*. (citing *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1192 (6th Cir. 1983)). "If he meets that requirement, the employer must show that the employee failed to mitigate damages by showing that (1) similar positions were available; and (2) the employee did not 'use reasonable care and diligence in seeking such positions.'" *Id*. (citing *Rasimas v. Mich. Dep't of Mental Health*, 714 F.2d 614, 624 (6th Cir. 1983)). Generally, the adequacy of mitigation is a question of fact. *Rasimas,* 714 F.2d at 623; *see also Summit Petroleum Corp. of Indiana v. Ingersoll-Rand Fin. Corp.*, 909 F.2d 862, 868 (6th Cir. 1990).

The Sixth Circuit has held that where "a defendant has offered *no* evidence indicating that 'substantially equivalent positions . . . were available' and that 'the claimant failed to use reasonable care and diligence in seeking such positions,' a plaintiff has no legal obligation to

demonstrate that he sought or obtained comparable employment after his unlawful termination." *Pittington*, 880 F.3d at 801 (quoting *Rasimas*, 714 F.2d at 624) (emphasis added). An employer also may mitigate his backpay liability "by showing that a discriminatee 'willfully incurred' a loss of earnings by a 'clearly unjustifiable refusal to take desirable new employment.'" *N.L.R.B. v. Ryder Sys., Inc.,* 983 F.2d 705, 712 (6th Cir. 1993) (citing *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 199–200 (1941)).

Questions of fact preclude summary judgment at this stage. For instance, Defendant has identified sufficient evidence to create a genuine issue of fact as to whether Plaintiff's job search process was reasonable, which must be viewed in light of the individual characteristics of the claimant and job market. *Rasimas*, 714 F.3d at 624. Plaintiff testified that in the two weeks prior to his deposition, he submitted one resume and "spoke to people at Kelly Services." (Plank Dep., Doc. 23 at PageID 174–75.) As of his deposition, he is unemployed. (*Id.*) He also testified that he never applied for a position at Great American after his termination. (*Id.* at PageID 175.) However, Stacy Lemmon told Plaintiff he could reapply to positions once he was recovered. (Lemmon Dep., Doc. 32 at PageID 490.) Great American has a witness to testify about open, comparable positions with Great American, which will be evidence as to the reasonableness of Plaintiff's search for substantially equivalent employment.

Defendant also argues that there is a question of fact as to whether Plank's conduct constituted a "willful loss of earnings" when he voluntarily quit his positions at Meijer and Kroger and was terminated from employment with Divisions. *See N.L.R.B.*, 983 F.2d at 712. Defendant may establish a loss of earnings if he voluntarily quits comparable work or if Plaintiff was discharged from interim employment for gross or egregious conduct. *Id.* Here, Plaintiff's deposition testimony establishes that he was terminated from employment at Divisions because

"it wasn't working out," raising a question of fact as to whether his termination from employment rises to a willful loss of earnings.

As in *Holloway v. Dodge*, addressing a similar motion by plaintiff on the defense of mitigation of damages, questions of fact preclude summary judgment for the Plaintiff on Defendant's mitigation of damages defense. No. 1:16CV1075, 2019 WL 3891852, at *2 (S.D. Ohio Aug. 19, 2019) (finding questions of fact as to availability of comparable employment and reasonableness of plaintiff's job search process precluded summary judgment on mitigation of damages defense). Thus, Plaintiff's motion for partial summary judgment is **DENIED**.

## IV. CONCLUSION

For the reasons set forth herein, Defendant's Motion for Summary Judgment (Doc. 26) is **GRANTED as to Plaintiff's retaliation claim and DENIED as to his failure to accommodate and disability discrimination claims.** Plaintiff's Motion for Partial Summary Judgment (Doc. 25) is **DENIED**.

**IT IS SO ORDERED.**

BY THE COURT:

S/Susan J. Dlott
Susan J. Dlott
United States District Judge